## COMMONWEALTH
v.
## Paul HUTCHINS

### No. 38265

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

**September 12, 1980**

Counsel of Record
Louis M. Nordlinger, Plaintiff
William Leahy, Defendant

## SUMMARY OF THE PROCEEDINGS FILED PURSUANT TO THE PROVISIONS OF G.L. CHAPTER 123A, SECTION 5

### Statement of the Case.

The petitioner Paul Hutchins filed, pursuant to G.L. chapter 123A, section 9, a petition for examination and discharge (being paper docket #36 herein). After a hearing on February 8, 1979, this court (Barton, J.) found him "a sexually dangerous person and denied prayers 5 and 6 of . . . (the) . . . petition." (See clerk's minutes VI.) However, the court did not dismiss the petition but continued it for a further hearing, which was held on September 4, 1980.

### Issues Presented.

1. Whether or not the petitioner is presently a sexually dangerous person within the meaning of c. 123A, sec. 1.

2. In the event that the court so concludes, whether nevertheless this court should enter an order providing for some community access or visitation; or, should further continue these proceedings pending approval by the authorities at Treatment Center of the petitioner's present application for community access.

It is to be specifically noted there has been no issue raised regarding any procedures relating to the original commitment or the propriety of the history as given from time to time by the patient to the Center's staff, consultants or examiners.

### Evidence Produced.

The Commonwealth presented two doctors who had conducted psychiatric examinations subsequent to the date of the last hearing. Both concluded Hutchins to be presently a sexually dangerous person. The petitioner presented a doctor who examined him on September 15, 1979 and again on July 6, 1980 and has concluded that Hutchins is "not a sexually dangerous individual". Additionally, by agreement the court considered numerous reports and examinations (reading the list orally into the stenographic record at the close of the hearing). The recommendation of the Department of Mental Health and the parole board, both required by sec. 9, were adverse to the petitioner.

### Discussion.

Paul Hutchins was indicted in December, 1962 for "indecent assault and battery". At or near the time of his arraignment on January 16, 1963, he pleaded guilty and was committed to the Sex Center at Bridgewater for sixty (60) days' examination, diagnosis and evaluation (under G.L. c. 123A, sec. 3 as it then appeared). Thereafter upon a hearing upon "the Report of Psychiatrists" (being paper docket #2), this court found the petitioner a sexually dangerous person upon

indictment 781 of 1963 on March 21, 1963. On the same date, both indictments numbered 779 of 1963, open to gross lewdness, and 780 of 1963, unnatural act, were dismissed while 777 and 778 of 1963, both alleging assault and battery by means of a dangerous weapon, were placed on file.

The petitioner was born on January 15, 1944. His mother is living. His father died in 1968, having long suffered from asthma and arthritis. He has an older sister living in a nearby area. His relationship with his mother was strained and antagonistic. His perception of his mother was of an aggressive and dominating figure who was both a strict disciplinarian and one who was generally disapproving of him. From the petitioner's point of view, she appeared to withhold affection. Tragically, this perception of his mother, and to some degree of his sister, led to an early manifestation of psychopathological symptoms. He developed an anger or intense rage and began to harbor sadistic fantasies with his mother being the principal subject thereof. Although it is possible that such an attitude as he imputed to his mother and sister could have been a contributing factor to his subsequent aberrant behavior, it was the professional opinion of his treating physician, after long observation, that given his basic personality disorder with its obvious potential for developing anger and reacting in a dangerous fashion, that it was probable that he would have acted out in the same fashion in reaction to other psychological stress which he would have encountered.

In any event, Hutchins did complete high school. It is impossible from the records furnished to this court to make any precise conclusions regarding his then intellectual ability. He repeated one grade. His schoolwork was average and his intelligence has been the subject of conflicting assessments from below average to average to above average. However, it is possible to make a plain and clear assessment with respect to his then emotional stability. He was withdrawn, without any close social relations, suffering from obesity and given to paranoia. He was subjected to fits of rage and anger and flights of fantasies. He appeared to lack the quality of compassion in human relationships and seemed to derive pleasure from cruelty.

When he was about fifteen years of age, he assaulted a boy (perhaps two) with a dangerous weapon, inserting the same rectally. He received out-patient psychotherapy at Mental Health Clinic, Boston, Massachusetts. At about this time he began experiencing auditory hallucinations. The behavior which was the subject of his commitment occurred on or about October 23, 1962. It was of a similar pattern to his earlier aberrant behavior; a cruel, physically abusive and sadistic attack upon a young boy. By patient history there were at least five such assaults in which the victim was first rendered helpless, then subjected to pain and sexual degradation. From these attacks, the petitioner received sexual gratification.

When he was first admitted to Bridgewater for evaluation prior to commitment, Hutchins related that he lived in a world of fantasy, suffering from hallucinations and suicidal ideas and entertained the thought of killing others. After his commitment, he was diagnosed as having a schizophrenic personality disorder with indications of hallucinations, bizarre ideation and very limited capacity to identify compassion with others. The prognosis was extremely guarded.

For several years, nearly a decade from 1963 to 1973, the therapy notes examined show an absence of any significant progress, confusion, paranoid thinking, depression and suicidal preoccupation. Generally he was passive and withdrawn. His

behavior was characterized as non-participating. He himself described his therapy sessions as talking or sitting before a stone wall. His weight fluctuated between 300 and 400 pounds. An examiner's note described him during this period as follows: "Withdrawn, sleeping, passivity, and non-participation." Perhaps it should be noted that once in 1966 he was confined for homosexual activity.

In 1972, progress reports indicated that Hutchins was basically schizophrenic, susceptible to serious regression, preoccupied with rage and aggression, and as one who was acutely psychotic with depressive features who needed watch to protect against a possible suicidal attempt. He made such an attempt in the spring of that year. Later that same year, he successfully escaped with a companion but was soon apprehended.

In retrospect, it appears that 1973 was a pivotal year although not then recognized as such. In May of that year, his prognosis was described as one which would "hardly inspire much optimism for the foreseeable future". Yet in January of 1973, the petitioner had commenced to visit with a new therapist, one Dennis McNamara. A rapport was established. Hutchins over a long period lost considerable weight pursuant to a planned and diligently pursued program. He gained much self-esteem. He began to look at himself in a realistic manner. By the end of 1974, he was described as "working very hard at establishing a therapeutic alliance" and having made "moderate accomplishments" and "some progress". Finally, and for the first time, the prognosis was described as "good". The date was January 17, 1975.

Thereafter in very late 1976, a program of temporary escorted visits were instituted both in response to his positive progress and by reason also of "the length of his incarceration at the Treatment Center". The program was for weekly escorted visits of from four to eight hours, designed to provide the basis of gradual re-entry into society, prevent institutionalization, to expand the petitioner's social horizons and to reinstitute a family relationship. The visits were to a specific destination with a pre-planned activity. Three separate examiners in 1977 found continued moderate progress.

Sadly, Hutchins' progress did not remain uninterrupted. He did complete more than sixty visits under the Center's Community Access Program. However, he repeatedly manifested poor judgment. In June, 1977, he smuggled $45.00 in cash into the institution either to spend in the canteen or for another patient. Hutchins' story was contradictory, and at first he denied it outright. For this reason, his visits were suspended for a month. It should be noted that this incident occurred shortly after an alleged but unproved involvement in an attempted escape by another patient. When his escorted visits were resumed, they were finally suspended in May of 1978. First there was an incident involving inappropriate behavior with another patient. The gravity of this happening is considerable notwithstanding that no sexual assault was proved. The behavior was at least similar to a spanking. Hutchins' description was that he "playfully hit him across the behind". However, spanking or striking buttocks was always a part of the sexual behaviors which brought him to the attention of the Treatment Center originally. The acting out of his sexual fantasies was not too dissimilar from this action. About a month thereafter there was a final event that occurred. It involved a publication, the subject of which was "child pornography" being smuggled into the Center by mail. Hutchins refused to identify a patient for whom the petitioner had allegedly used his mail in this attempt. This led to the termination of his access program.

A subsequent attempt to reinstitute community access after the April termination failed in September, 1978 when the Pre-Release Board unanimously rejected him. In the meantime, Hutchins filed the present petition on May 10, 1978. It was heard on February 8, 1979 and this court (Barton, J.) found the petitioner to be presently sexually dangerous and denied the relief sought in prayers numbered 5 and 6 of the petition. The court, however, did not dismiss the petition but merely continued the same, holding a "status" hearing thereon on September 27, 1979. This continuance was obviously to give the petitioner an opportunity to make application for a community access program and the institution the opportunity to assess anew the petitioner's eligibility. The transcript of the prior hearing reveals that both psychiatrists testified that they supported Hutchins' application. However, the Pre-Release Review Board subsequently denied the request. The petitioner, therefore, pressed for a present determination under sec. 9.

**Finding.**

I find the petitioner Paul Hutchins to be presently a sexually dangerous person as that phrase is found in G.L. c. 123A, sec. 1, and am so satisfied beyond a reasonable doubt.

**Reasoning.**

The petitioner has much cause to feel confident as to his own capacities. He observed in January 9, 1979, "I'm not saying that I'm not sexually dangerous but I have reached a point where I have good control and would not hurt anybody." At the present time, he resides on the Maximum Privilege Tier. He has been taking part in Assertiveness Training and Relaxation Training. He has been working half days in the kitchen for several months. About ten months ago, his therapist and he agreed that it was time to open up a new treatment opportunity and he began to treat with a woman therapist. Although disappointed by his failure to regain a community access program, he has continued to work hard.

The petitioner's counsel urges the court not to dismiss the instant petition in any event and to either fashion and order a program providing community access, or at the least, to retain jurisdiction until the authorities at the Treatment Center pass upon the latest application for limited release filed by this petitioner.

Two questions arise, the power of this court so to do; and assuming that it has such power, the wisdom of exercising that discretion in this case. The answer to the first is plainly in the affirmative. The answer to the second is in the negative.

This summary provides an appropriate opportunity to address an area of considerable and growing confusion and difficulty. Apparently, and for some reason that escapes the comprehension of this court, **Commonwealth v. Travis,** 372 Mass. 238 has been misperceived and much misunderstood. The problem has not been limited to opposing counsel but the difficulty has spread to the authorities at the Treatment Center. It seems, therefore, only prudent to make certain basic and rudimentary observations. The so-called Sexually Dangerous Persons Act, G.L. c. 123A, must be construed as affording the same constitutional rights and remedies as any other piece of legislation. Therefore, not surprisingly, courts have interpreted the statutory language from time to time in a manner which avoids any constitutional prohibition. For example, the phrase "a hearing" as found in section 5 has been determined to imply within it a hearing with the effective assistance of counsel from its initiation. The requirements of the "probation record" as that phrase is found in section 4 and the admissibility of "any psychiatric report" as that phrase is found in section 5 has been

interpreted to avoid hearsay and any problem with the confrontation clause of the Sixth Amendment. Likewise, the language "no longer sexually dangerous" has been interpreted as meaning sexually dangerous presently beyond a reasonable doubt. Courts (both of this Commonwealth and those federal tribunals which have dealt with this statute) have followed that well-established rule of statutory construction that wherever possible a statute shall be construed so as to be within constitutional parameters. Succinctly put, the construction of this act is not new, novel, nor unique nor particularly innovative.

The second basic legal principle that should be noted is that fundamentally expressed legislative policy considerations are to be considered in the judicial construction of any questioned statute. Chapter 123A created a complete program to identify and treat certain sexually dangerous people. The purpose is so obvious that it hardly needs to be stated. It is to insulate society from the consequences of a behavioral risk while identifying and treating the sexually dangerous so as to enable those persons to comport themselves in a socially acceptable manner. The publicly expressed and laudable goal of the program is the successful treatment and rehabilitation of the patient. It is achieved when the patient has acquired such self-control over his impulses, urges and wants so as to permit him to refrain from conduct which society finds impermissive.

The third and last basic observation appropriate here is that it is beyond any human sagacity to predict the duration of a presently existing condition of dangerousness. The Legislature gave the judge a wide area of discretion. After finding one to be within the class of persons for whom such a designation is appropriate, the judge may confine such person to the Center or some other "mental institution" or place him "upon . . . (an) . . . outpatient treatment" regimen or may make any other disposition recommended by the Department of Mental Health. The Legislature was well aware that different individuals may require different methods. One patient may be required to suffer confinement while another may need but a loosely structured, largely voluntary and unsupervised program. Judicially interpreted, the purpose of the hearing is "to find the best disposition available". **Commonwealth v. Rodriguez,** Mass. Adv. Sh. (1978) 2864. Of course, the opinions of the treating psychiatrists, the observations and judgments of the Center's professional personnel and the expertise of the Department of Mental Health are of great value in fashioning the restraints to be imposed by the best disposition available. They are, however, plainly not controlling. The law requires that the least stringent practical alternative available in questions regarding the possible confinement of non-criminals be the one which is employed. Just as the question of whether or not one is sexually dangerous is a legal and not a medical question, likewise, the question of what degree of control and duress is proper (constitutionally permissive) is a legal rather than a medical issue.

Plainly, therefore, interlocutory orders issued by this court during the pendency of a petition seeking examination and discharge which have as their subject matter the amount and degree of compulsion to which the petitioner shall be subjected are proper.

In this case, however, the court declines as a matter of discretion either to enter any order or to continue the petition. This is because of the facts as they appear.

Although presently there is no evidence of hallucination, he still is subject to fantasies. Even though presently on a strict regimen of individual and group therapy and

education, he plainly manifests difficulty in exercising sound judgment and in dealing with reality. Even in a controlled environment, his self-control is fragile and somewhat tenuous. Further, as noted recently, "there remains a core of sadistic, primitive conflict resolution which still exists in fantasy. It is difficult to predict if he could maintain without institutional supports and not regress to this pathological core." In sum, he is working hard and making progress but he has all the indicia of a long-term treatment case. Release is to be accomplished only by a very extended and supportive program which must be subjected to a rigid monitoring procedure.

The fact that this court is of the opinion that the petitioner may be ready for supervised and escorted community visits does not become dispositive of that issue. This case is among those situations where it would be inappropriate (as well as imprudent) to impose or institute any program at the present time. Hutchins' problem is still long range. It is for the professional staff in its collective expertise to make those initial judgments as to the petitioner's readiness for community access. In sum, there remains a present need for considerable flexibility and caution in the treatment of this patient. It is appropriate that the treating staff using Hutchins' social behavioral responses to the situation and stresses as they unfold as beacons or guidelights to assess his readiness (or more properly, his ability) to comport himself responsibly.

In dismissing this petition, the court is not unmindful of the disappointment that such an adverse ruling brings to the petitioner. He has labored in earnest for a considerable period to overcome his incapacity. It is important, however, that he face and deal with realities and one such reality is that he is not ready for release and is in need of continued treatment under long-term supervision.

Fortunately, another reality is that the prognosis for his cure is now good and his anticipation for some structured access to the outside world is reasonable. Further, the law provides, pursuant to the provisions of G.L. c. 123A, sec. 9 a swift resort to judicial review in the event that he is aggrieved by any subsequent action or decision of the Treatment Center. Therefore, there does not appear to be any reason to further continue this petition.

**Conclusion.**

The petition shall be endorsed this date as follows: "After hearing and having taken the matter under advisement, the court finds the petitioner to be presently sexually dangerous and dismisses the within petition upon findings and reasoning set forth in the written summary required by chapter 123A, section 5 filed this date."

**John T. Ronan**
**Justice of the Superior Court**